## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 19-62 |
| | ) | Judge Nora Barry Fischer |
| ERICK ALEXANDER MARTINEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

Presently before the Court are both a pro se motion and a counseled motion to reduce sentence under 18 U.S.C. § 3582(c) filed by Defendant Erick Alexander Martinez, (Docket Nos. 295, 298), and the Government's opposition thereto, (Docket No. 302).  Defendant seeks to reduce the 78-month sentence imposed by this Court to 46 or 62 months based on the retroactive changes for zero-point offenders set forth in Amendment 821 to the U.S. Sentencing Guidelines, the application of which would reduce the advisory guidelines range in his case.  (Docket Nos. 295; 298).  While the Government concedes that Defendant is eligible for a reduction, it maintains that the Court should deny the requested relief after considering the relevant § 3553(a) factors. (Docket No. 302).  After careful consideration of the parties' submissions, and for the following reasons, Defendant's Motions [295] and [298] are denied as the Court declines to exercise its discretion to reduce Defendant's sentence because the 78-month term of imprisonment recommended by the parties as part of their Rule 11(c)(1)(C) sentencing agreement and accepted by the Court remains sufficient, but not greater than necessary to meet all of the goals of sentencing in this case.

### II.     BACKGROUND AND PROCEDURAL HISTORY

On February 26, 2019, a federal grand jury returned an Indictment against the Defendant

charging him and two co-defendants, Brandon Winters and Eduard Guzman Rijo, with one count of conspiracy to possess with intent to distribute and distribute one (1) kilogram or more of heroin and four hundred (400) grams or more of fentanyl in violation of 21 U.S.C. § 846. (Docket No. 51). Winters was also charged with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) and 841(b)(1)(A)(iv). (*Id*.). Defendant's arraignment was held on March 13, 2019, at which time he pled not guilty and his bond was continued.[1] (Docket Nos. 79; 80).

The change of plea hearing was held on May 12, 2020 by videoconference.[2] (Docket Nos. 174-176). At the change of plea hearing, as is the Court's practice, it conducted an extensive colloquy with Defendant to confirm that he was competent, that he understood the Constitutional and other rights that he was waiving by entering a guilty plea, and that he was knowingly and voluntarily pleading guilty. (Docket No. 278). To that end, Defendant reported that he is a high school graduate with no mental or physical ailments, and that he was not impaired by drugs or alcohol at the hearing. (Docket No. 278 at 5-6, 36). Additionally, Defendant testified that he understood that by pleading guilty he waived his rights to various defenses, such as challenging the Indictment based on the Constitution.

> THE COURT: Moreover, if you plead guilty to this charge, do you understand you're giving up defenses you might have had to the offense charged, including defenses or challenges to the indictment based on the Constitution and you won't be able to raise those defenses or challenges after you plead guilty? Do you understand all of that?
>
> THE DEFENDANT: Yes.

---

[1] Defendant was initially arrested and charged under a criminal complaint on February 1, 2019 but was released on bond on February 4, 2019. (Docket Nos. 37; 47-49).

[2] The use of videoconference was authorized by the Administrative Order issued by Chief Judge Mark R. Hornak at Misc. No. 2:20-mc-394-MRH, due to the COVID-19 pandemic and the Court found that Defendant knowingly and voluntarily waived his right to an in-person proceeding and consented to the use of videoconferencing. (Docket Nos. 174; 175).

(Docket No. 278 at 19-20).  Defendant further stated that he had sufficient time to speak with his

attorney, and that he was satisfied with his attorney's work.

> THE COURT: . . . Let me ask you this: have you had sufficient time to talk about your case with your attorney, Mr. Dresbold?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Are you satisfied with the job he's done for you so far?
>
> THE DEFENDANT: Yes.

(Docket No. 278 at 13).  He also affirmed that he had the opportunity to read and review the

Indictment with his attorney, that he understood the Indictment and the nature of the charge, and

that he had no additional questions about the Indictment or the charge.

> THE COURT: Okay. Mr. Martinez, have you been provided with a copy of the indictment that outlines the charge against you? Did you ever get a copy of the indictment?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. Did you have an opportunity to read it through?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And did you also go over it with [your attorney] Mr. Dresbold?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And specifically, did you discuss with him the charge in the indictment to which you intend to plead guilty?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And to the extent you had any question, comment, or concern about that, did you have a chance to talk to your attorney about that?
>
> THE DEFENDANT: Yes.

. . .

> THE COURT: So you understand you're charged at Count One of the indictment and may plead guilty to one count of conspiracy to possess with intent to distribute and distribute 1 kilogram or more of heroin and 400 grams or more of fentanyl, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(i), and 841(b)(1)(A)(vi), in violation of Title 21, United States Code, Section 846, for conduct occurring in and around January of 2019? You understand that that is the nature of the charge, Mr. Martinez?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Once again, do you have any questions for either your attorney or the Court about this charge?
>
> THE DEFENDANT: No.

(Docket No. 278 at 14-15).

Defendant confirmed that he understood the potential statutory penalties included a mandatory period of incarceration of 10 years and up to life imprisonment.  (Docket No. 278 at 21-23).  The prosecutor noted that the quantity of controlled substances was at least 1.2 kilograms but less than 4 kilograms of converted drug weight for a base offense level of 32 and with a three-level reduction for acceptance of responsibility, his total offense level would be 29. (*Id*. at 26).  After considering Defendant's criminal history category of I, the prosecutor estimated that the advisory guidelines range would be 87 to 108 months' incarceration.  (*Id*.).  He added that Defendant remained subject to the mandatory minimum of 120 months' incarceration unless he qualified for the safety valve.  (*Id*.).   Defense counsel stated that he generally agreed with the prosecutor except that he may oppose the drug quantity and conversion of fentanyl and heroin and argue for a base offense level of 30.  (*Id*.).  With all of that said, Defendant admitted under oath that he understood these were estimates and that no one had promised or predicted his sentence at

that time.

> THE COURT: Has anyone made any kind of a promise to you that's caused you to want to plead guilty?
>
> THE DEFENDANT: No.
>
> THE COURT: Has anyone made any kind of a prediction or a promise to you as to what your actual sentence will be?
>
> THE DEFENDANT: No.

(Docket No. 278 at 35-36).

The prosecutor next detailed the evidence of the conspiracy, Defendant's role, and the type and quantity of drugs involved in the offense.  (Docket No. 278 at 30-33). Additionally, Defendant and his counsel confirmed that they had reviewed a written copy of the factual summary of the evidence which had been provided in advance of the proceeding by the prosecutor.  (Docket No. 278 at 33).  The factual summary was then read into the record by the prosecutor, as follows:

> Your Honor, the government's evidence would show that in late 2018, the Pennsylvania State Police and the FBI began receiving information regarding the cocaine and heroin distribution associated with the co-defendant in this case, identified as Brandon Winters, along with his co-conspirators, and as part of that investigation, the case agents began extensive surveillance at apartment 205, which is located at 220 Heinz Street. That building is known commonly as Heinz Lofts Apartments.
>
> The government's evidence would show that co-defendant Brandon Winters and his co-conspirators, including the defendant, utilized apartment 205 within Heinz Lofts Apartments in Pittsburgh.
>
> On January 25, 2019, Chief Magistrate Judge Eddy issued a search warrant for apartment 205 within Heinz Lofts Apartments. Thereafter, on January 30, 2019, agents were conducting both electronic and physical surveillance at apartment 205 within the Heinz Lofts, believing that co-defendant Winters was expecting a resupply of narcotics that day.
>
> During that surveillance session, agents observed the defendant and his alleged co-conspirators: Eduard Rijo -- spelled E-

D-U-A-R-D, last name, Rijo, R-I-J-O -- and Brandon Winters, coming and going to and from apartment 205, oftentimes together. For example, at approximately 2:00 a.m. on January 30th, agents observed co-defendant Rijo walk out of apartment 205, walk to the stairway of the building, and let the defendant into the common hallway at Heinz Lofts.

Agents observed the defendant and co-defendant Rijo walk into apartment 205 together. Shortly thereafter, the defendant was observed leaving the apartment, walking back down the stairway, and entering his black Nissan Maxima, which is registered to him, and depart the area.

Several hours later, around 1:20 in the afternoon that same day, case agents observed co-defendants Winters and Rijo leaving apartment 205 together. They returned that day around 3:34 p.m. carrying groceries. And shortly after that, around 4:27 p.m., agents observed co-defendant Rijo walk out of apartment 205 and exit toward the elevator, which leads to the parking garage for building 220.

Around the same time, agents observed the defendant drive his Nissan Maxima into the garage for building 220.

Shortly thereafter, co-defendant Rijo left the garage and walked back into apartment 205, pulling a multicolored roller duffel bag. As co-defendant Rijo walked into apartment 205 with the roller bag, investigators observed the defendant drive his Nissan Maxima out of the parking garage, and park the vehicle in a visitors' parking lot. Agents then observed the defendant walk into the building and into apartment 205.

Once the defendant and co-defendants Winters and Rijo were all believed to be inside of apartment 205, agents made entry pursuant to the search warrant. There, agents found co-defendant Winters, Mr. Rijo, and the defendant within the living room area of the apartment.

Over $250,000 in United States currency was scattered in the living room area, and it appeared to the agents that the defendants had been handling or counting the currency prior to their entry into the apartment.

Nearby, on the floor of the kitchen area, agents found the same multicolored roller duffel bag, which co-defendant Rijo was observed pulling when he entered apartment 205 shortly

beforehand.

Inside of that roller duffel bag, investigators recovered approximately 1,500 bricks -- which is the equivalent of roughly 75,000 individual dosage units – containing suspected heroin/fentanyl mixtures. Through a search of Mr. Martinez's black Nissan Maxima, agents uncovered an extensive hidden trap compartment, and the government would prove that that hidden trap compartment is a tool that's commonly used by narcotics traffickers and was intended to be utilized by Mr. Martinez to smuggle narcotics and/or the financial proceeds from the distribution of narcotics.

Subsequent chemical testing of the 1,500 bricks of suspected heroin/fentanyl confirmed the presence of both heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, and that the aggregate weight of those mixtures was determined to be more than 1 kilogram of heroin and consequently, more than 400 grams of fentanyl.

Through expert testimony, the government would prove that the quantity of seized heroin/fentanyl mixtures was undoubtedly possessed for further distribution.

And that is all.

(Docket No. 278 at 29-33).  The Court noted that Defendant was "listening very intently" to the prosecutor's factual recitation and asked if he wished to make any additions or corrections to which he declined.

THE COURT: . . . Now, Mr. Martinez, having gone over it with your own attorney and having just heard Mr. Moschetta go through the facts of your case, do you agree with what he said as to the factual summary? Are there any additions or corrections you want to make?

THE DEFENDANT: No, Your Honor.

(Docket No. 278 at 33).

During the proceeding, the parties reported that they did not have a plea agreement and the case proceeded through the presentence process.  (Docket No. 278 at 20).  A Final Presentence

Investigation Report ("PIR") was disclosed to the Court on July 24, 2020. (Docket No. 191). The Court issued its Tentative Findings and Rulings on August 14, 2020, wherein it noted that there were no disputes as to the drug quantity and also accepted the Probation Office's conclusion that the base offense level was 30 because the converted drug weight attributable to Defendant was at least 1,000 kilograms but less than 3,000 kilograms.  (Docket No. 200).  At the time, the Court found that the advisory guidelines range was 120 months' incarceration as the statutory mandatory minimum penalty exceeded the otherwise applicable guidelines range of 70-87 months' imprisonment. (Docket No. 200).  Defendant subsequently objected to the PIR and the Tentative Findings and argued that the safety valve provision under 18 U.S.C. § 3553(f) should be applied in this case.  (Docket Nos. 241; 243).  As such, the Court continued the sentencing and ordered briefing from the parties.  (Docket Nos. 241; 243; 253; 257).

Ultimately, the Court did not resolve their disputes because on October 28, 2021, the parties entered into a sentencing agreement wherein they agreed to Defendant's eligibility for the safety valve under 18 U.S.C. §3553(f) and to a stipulated sentence under Rule 11(c)(1)(C) of 78 months' imprisonment and four (4) years' supervised release.  (Docket Nos. 289 at 12; 262 at 1). A Supplemental Addendum to the PIR was filed to reflect their stipulations. (Docket No. 262). The Court also issued Supplemental Tentative Findings and Rulings which noted that given the application of the safety valve, Defendant was no longer subject to the mandatory minimum penalties, his offense level was reduced by an additional 2-levels under Guideline § 2D1.1(b)(18), and his advisory guidelines range was 57 to 71 months' incarceration. (Docket No. 268).

At the sentencing hearing on December 15, 2021, no objections were lodged to the PIR, the Addenda, nor the Court's Supplemental Tentative Findings and Rulings and both parties advocated that the Court should accept their agreed-upon sentence. (Docket No. 289).  During the

sentencing, the Court confirmed that Defendant understood the agreement, reviewed it with his attorney, and consented to the specific sentence under Rule 11(c)(1)(C).  (Docket No. 289 at 14). Defendant further reported that he had read the PIR, the Addenda, and both sets of Tentative Findings, and that he had no questions as to those materials.  (Docket No. 289 at 20-21).  Counsel for both parties briefly advocated that the Court accept their sentencing agreement.   Defense counsel advocated as follows:

> MR. DRESBOLD: […] I don't have much to add, Judge. I believe all of the factors are met by our sentencing stipulation. I think this is a reasonable resolution, given all of the factors that you discussed and the negotiations in this case and the facts of this case. I'd ask that you accept the sentencing stipulation, as you've indicated you intend to.
>
> And Mr. Martinez asks [for] a recommendation [that he] be placed [… and] be allowed to serve his incarceration, if the Bureau determines it proper, at Fort Dix, D-i-x, in New Jersey. He identified a number of classes that Fort Dix offers as far as drug treatment and also job training that he'd like to participate in. It's also close to home and his family in New York. With that, I'll allow him -- or I'd defer to him if he'd like to make a statement to the Court of allocution. And I have nothing further. Thank you.

(Docket No. 289 at 25-26).  The prosecutor argued as follows:

> MR. MOSCHETTA: Your Honor, I would echo what Mr. Dresbold said inasmuch as I believe the parties' written submissions to the Court outline in detail the basis for this sentencing stipulation and, in particular, the 78 months of imprisonment that are agreed to therein. This sentence does represent an above-guideline sentence once the safety valve is factored in; and there are reasons of record for the Court, I believe, to sentence Mr. Martinez above the guidelines.
>
> Principally, the parties are both giving up or are foregoing any further litigation over the application of the safety valve; and as you know from the parties' written submissions, there were some questions about whether or not the safety valve should apply. If the Court found that it did not apply, Mr. Martinez would have been facing a much more significant sentence of imprisonment of 120 months.

The government is agreeing not to pursue that sentence and agreeing to the safety valve, which is a great benefit to Mr. Martinez even though the recommended sentence is above the sentencing guidelines. The facts and circumstances of this case certainly warrant an above-guideline sentence.

Mr. Martinez was involved in a conspiracy to distribute fentanyl here in the Western District of Pennsylvania, and certainly the Court is mindful of the harm and the danger that's presented to the community from engaging in such conduct. And the seriousness of the offense – although Mr. Martinez has no criminal history whatsoever -- I think warrants an above-guideline sentence in this matter, particularly given the fact that he is no longer facing the 120-month statutory minimum sentence that he could have faced were it not for the safety valve. So we would ask that you take those factors into consideration, along with the other information and argument presented to the Court in writing and accept this sentencing agreement that's been put forth.

(*Id.* at 26-27).

Defendant then made a statement of allocution to the Court:

THE DEFENDANT: First of all, I just want to say thank you and that I am human and I made a mistake, and I've been working since that happened. I'm doing everything that I can to do right by the community. And I would just like to ask the Court to let me do my time as close as possible to my family so I could go as soon as possible. Just that. And thank you for giving me this time to be with my family this past three years this has been going on. I appreciate that.
Thank you, Your Honor.

(Docket No. 289 at 27-28).

After hearing Defendant's statement and the parties' arguments, the Court accepted the

parties' sentencing agreement and provided the following reasons supporting this decision.

THE COURT: Okay. Mr. Martinez, the Court acknowledges your statement. I appreciate your sentiments. Thank you for making the statement to the Court. Given that both attorneys have argued and Mr. Dresbold has given me his recommendations, the Court's first going to turn to the sentencing agreement. As I had indicated to the attorneys when we did the presentence telephone call, I was inclined

to accept the sentencing agreement, and I still am.

Of course, I always wanted to see Mr. Martinez and see how he was doing. And relative to that, when I consider all the 3553(a) factors, I believe that this sentence proposal is reasonable in this particular case; namely, 78 months of incarceration, to be followed by a four-year term of supervised release, and a special assessment of $100. [...]

And I also believe this is a sufficient sentence and not greater than necessary. So the reasons for this are as follows: Number one, I'm certainly familiar with the facts and circumstances of this offense. They're outlined in the presentence investigation report. And as Mr. Moschetta pointed out, this was a conspiracy involving this defendant, along with two others, and they were engaging in significant heroin and fentanyl trafficking here in Pittsburgh.

In total, the defendant and his co-conspirators are responsible for more than a kilogram of heroin and 400 grams or more of fentanyl. On the date of their arrest – namely January 30, 2019 -- the defendant and his co-conspirators were found in possession of 1,500 bricks of heroin/fentanyl and over $250,000 in United States currency. Authorities also found a special trap compartment in a vehicle in the defendant's possession, and that was used to help with the transport of drugs and/or the drug proceeds.

Certainly, the seriousness of this offense is reflected in the potential penalties; and to that end, Mr. Moschetta reflected on the fact that there was the potential here of 120 months and up to life imprisonment. However, following litigation and argument and negotiation, the mandatory minimum sentence no longer applies because the safety valve does; and, instead, Mr. Martinez becomes subject to an advisory guideline range of 57 to 71 months that we're going to go a little bit above in this particular case.

Now, relative to his acceptance of responsibility, early on Mr. Martinez agreed to plead, and he pled with an open plea, and that was entered into while this sentencing factor dispute remained. I've also considered his personal history and characteristics; and as Mr. Moschetta rightly pointed out, this man comes before the Court without a criminal history, which is pretty remarkable for this type of activity. He had no prior adult convictions or juvenile adjudications.

As to his family circumstances, the Court took into account that he was initially born overseas in the Dominican Republic. His father

moved to Yonkers, New York, and then the defendant moved to follow his father there. At age 15 he became a naturalized citizen, for which the Court applauds him, and the family generally did well and his needs were met. But having said that, you know, there was something here that must have led him astray. He does tell the Court, too, that he sponsored his mom's immigration to the United States. And he now lives with his fiancee, Dinelia, D-i-n-e-l-i-a, Sanata, S-a-n-a-t-a, and their combined family. They have one child together, and they have children from prior relationships; as I mentioned early on, all together three children. And, fortunately, they're healthy. And as Mr. Martinez appears before the Court, he's healthy. He's not on any medications. And fortunately for him, too, he doesn't have any mental health or substance abuse problems that have been reported to the Court.

I also am mindful of the fact that the COVID-19 pandemic has made conditions of confinement more onerous for those that have been incarcerated during this time period. He's thanked the Court for the fact that he's not had to be incarcerated during this time period.

As to educational background, again, Mr. Martinez, you're fortunate to have a high school degree plus some additional training. And I do hope, like Mr. Dresbold, that you'll follow up with your plans at Fort Dix and get yourself more vocational training; because, to that end, you've already demonstrated with the work you currently do that you can be a hard worker. With some kind of skill, that could benefit you and your family even more.

And as I noted and one of the other reasons why I decided to go this route of the agreed sentence is you have an extensive employment history. You've been a laborer, and you also -- you were a laborer for Bartlett Tree Experts, for example. But even though you lost that job for a bit because of the COVID pandemic, you went right back to work. You also have worked as a packaging manager and a parttime pizza delivery driver. And this has been consistent, you know, going back to about 2006 that you've always had a job of one sort or another. And as you know, you're currently working full time; and as you just told me, you've progressed in the job.

Now, having said all of that, I also have to deter people from engaging in drug trafficking, particularly heroin and fentanyl, and we all know that those two together are more than a deadly combination. Indeed, the Sentencing Commission put out this whole book on fentanyl and fentanyl analogs back in January of 2021.

And if you read the papers here today, you will have read that our

Senator Toomey from the Philadelphia area and a representative from this area have gotten together in a bipartisan way, and they're trying to curtail the shipments of fentanyl into this country from places overseas, such as China. And the reason for all of this is because this kind of drug trafficking poses a substantial risk of harm to the community.  Statistics from the Centers for Disease Control and Prevention show that opioid-related overdose deaths rose at least five times from 1999 until the mid 2000s; then, frankly, they leveled off a bit, largely due to the fact that there were prosecutions being brought. But, unfortunately, because of the pandemic, overdoses have now escalated. The use of heroin and fentanyl has escalated. And so even despite the president having declared a national emergency, even despite prosecutors like Mr. Moschetta, we still have an epidemic, if you will, of drugs, particularly heroin and fentanyl. And these drugs are more deadly and have caused not only overdose[s] but deaths. I think, in fact, […] it was reported there were 100,000 overdose deaths in this country this past year. That's a pretty mind-boggling number.

I've also mentioned in other sentencing hearings that I've had the occasion to actually impose restitution orders because family and friends have shown up asking the Court to reimburse them for medical bills and funeral bills for people who overdosed. And, as I said, the overdoses are usually heroin and fentanyl.

I also recognize the fact that this opioid abuse has affected children. We have a whole center at Magee-Womens Hospital that deals with babies born of addicted moms. And then we have grandparents and guardians and foster parents and others who have had to come in and take over raising kids because the moms and dads are incapacitated from drug use and/or in jail themselves. So when you take that all together, heroin and fentanyl, along with other opioids, certainly present a scourge on this community. I've also taken into account, Mr. Martinez, how you've behaved yourself leading up to this sentence. As I noted, you pled early on. I have not had any adverse reports about you. You've worked a job, you've maintained your family ties. So all of that leads me to think that this sentence is appropriate.

And, finally, I would observe the fact that this sentencing stipulation does preserve resources, not only of the U.S. Attorney's Office and the law enforcement officers that might have to be called as witnesses, but also this court and, indeed, Mr. Dresbold and his office. So to that end, for all of those reasons, I do think that I should and I will accept this recommendation of a sentence of 78 months incarceration, four years supervised release, and the payment of the

13

special assessment.

(*Id*. at 28-34).

Accordingly, the Court accepted the parties' recommendations and sentenced him to 78 months' imprisonment and 4 years' supervised release. (Docket No. 272). A fine was waived given his in ability to pay and he was ordered to pay a $100.00 special assessment and to forfeit any interest in the following property to the United States: $250,138.91 in United States currency; a 2012 Porsche Panamera; and his 2007 Nissan Maxima which had the extensive trap compartment and he used to smuggle drugs and/or drug proceeds. (*Id*.). The Court also recommended to the BOP that Defendant serve his period of incarceration near his family at FCI Fort Dix; be given a job in prison; and be provided with any available educational and training for which he qualified. (*Id*. at 2).

Defendant did not appeal his sentence but on September 7, 2022, he filed a Motion to Vacate his sentence arguing he was provided ineffective assistance of counsel. (Docket No. 273 at 4). After receiving briefing from the parties, the Court issued a Memorandum Opinion and Order on January 5, 2023 denying his motion. (Docket Nos. 290; 291). Relevant here, the Court rejected Defendant's claim that his counsel provided ineffective assistance during plea and sentencing proceedings. Among other things, the Court held that:

> [a]t the sentencing hearing, the Court thoroughly discussed the Rule 11(c)(1)(C) sentencing agreement with Defendant and he agreed to the terms, including that the sentence of 78 months' incarceration and 4 years' supervised release would be imposed by the Court. (Docket No. 270-1). He also received substantial benefits under the agreement as the Government conceded that the safety valve applied such that he was no longer subject to the mandatory minimum term of 120 months' incarceration. *See e.g., United States v. Gardenhire*, Cr. No. 15-87, 2020 WL 6826582, at *4 (W.D. Pa. Nov. 20, 2020) (rejecting claim that defendant was prejudiced as he knowingly and voluntarily accepted Rule 11(c)(1)(C) plea agreement which significantly limited his sentencing exposure). All told, the record

14

> reflects that Defendant fully understood the scope of his rights, the charges against him and the consequences of pleading guilty and specifically agreed to the sentence imposed of 78 months' incarceration and 4 years' supervised release. As such, Defendant's § 2255 Motion must be denied to the extent that he raises claims that his counsel was ineffective during the plea and sentencing hearings which are plainly refuted by the record.

(Docket No. 290 at 14). Defendant appealed this Court's ruling but his request for a certificate of appealability was denied by the U.S. Court of Appeals for the Third Circuit on July 31, 2023. (Docket No. 294).

Defendant self-reported to FCI Fort Dix on February 9, 2022 and he has been in custody for a period of 2 years, one month and 24 days. (*See* Docket No. 302-1). The BOP currently reports that he has a home detention eligibility date of April 9, 2026 and his projected release date is October 7, 2026. (*Id*.).

On November 21, 2023, Defendant filed a pro se motion to reduce sentence. (Docket No. 295). Subsequently, on January 9, 2024, CJA counsel was appointed to represent Defendant pursuant to the Administrative Order at Misc. No. 2:23-mc-1227 in order to evaluate whether he qualified for a sentence reduction under Amendment 821 and to bring a motion on his behalf. (Docket No. 297). Thereafter, a counseled motion seeking a sentence reduction was filed on Defendant's behalf along with supporting documents including, his inmate education data transcript showing that he has completed numerous courses while in custody, certificates of completion for drug and alcohol and forklift operation courses and a letter of recommendation. (Docket No. 298). The Court has also received and reviewed the Government's Response in opposition. (Docket Nos. 298; 302). Although Defendant was afforded the opportunity to file a Reply by February 23, 2024, he declined to do so and the Court considers the matter to be fully briefed and ripe for disposition.

III.     LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is 18 U.S.C. § 3582(c), which provides "an 'exception to the general rule of finality' over sentencing judgments." *United States v. Rodriguez*, 855 F.3d 526, 529 (3d Cir. 2017), *as amended* (May 1, 2017) (quoting *Dillon*, 560 U.S. at 824).

> Section 3582(c)(2) applies to amendments to the Sentencing Guidelines. It provides that a district court may reduce a sentence if two conditions are met: (1) the defendant was sentenced "based on a sentencing range that has subsequently been lowered by the Sentencing Commission" and (2) "a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

*Rodriguez*, 855 F.3d at 529 (quoting 18 U.S.C. § 3582(c)(2)) (further citation omitted).  If it is determined that a defendant is eligible for relief under Guideline § 1B1.10, "§ 3852(c)(2) [next] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies […] is warranted in whole or in part under the particular circumstances of the case." *Dillon*, 560 U.S. at 827.  "In addition, a district court 'shall consider the nature and seriousness of the danger to any person or the community' and 'may consider post-sentencing conduct of the defendant.'" *Rodriguez*, 855 F.3d at 529 (quoting U.S.S.G. § 1B1.10, cmt. n.1(B)(ii-iii)) (further citation omitted).  A defendant does not have a right to an evidentiary hearing in section 3582(c) proceedings as such proceedings "do not constitute a full resentencing of the defendant." U.S.S.G. § 1B1.10(a)(3); *see also* Fed. R.

Crim. P. 43(b)(4) ("A defendant need not be present" when "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)").

IV.     DISCUSSION

At the outset, the first step of the Court's analysis is uncontested as the parties do not dispute that Defendant is eligible for a sentence reduction under Amendment 821.  (Docket Nos. 295; 298; 302).  The Court agrees that Defendant is eligible for a reduction of his sentence because Amendment 821 includes an additional 2-level reduction for offenders like Defendant who had zero criminal history points at the time of sentencing.  *See* U.S.S.G. § 4C1.1 (eff. Nov. 1, 2023) ("If the defendant meets all of the following criteria [in (1)-(10)] decrease the offense level determined under Chapters Two and Three by 2 levels.").

In this Court's estimation, if Amendment 821 was in effect at the time of Defendant's sentencing, he would be entitled to an additional two-level reduction to his offense level and his criminal history category would remain unchanged.  Based on a total offense level of 23 and a criminal history category of I, Defendant's advisory guidelines range would be reduced to 46-57 months' incarceration.  The relevant guideline, § 1B1.10(b)(2)(A), contains a limitation that Defendant's sentence may not be reduced "to a term that is less than the minimum of the amended guideline range," U.S.S.G. § 1B1.10(b)(2)(A), such that Defendant's sentence cannot be reduced below 46 months.

With that background, the Court turns to the second step of its analysis.  *See Dillon*, 560 U.S. at 827.  Naturally, the parties dispute whether the Court should exercise its discretion to reduce his sentence after consideration of the § 3553(a) factors with the defense advocating that a reduction is warranted and the Government countering that any reduction would be inappropriate. (Docket Nos. 295; 298; 302).

Having carefully considered the parties' positions in light of the totality of the circumstances and all of the relevant § 3553(a) factors, the Court believes that the recent amendments under the U.S. Sentencing Guidelines which retroactively reduced the offense level for zero-point offenders like Defendant do not outweigh the § 3553(a) factors supporting the 78-month sentence, particularly given the substantial benefits he received under the Rule 11(c)(1)(C) sentencing agreement, and the fact that the Court would have accepted the agreement and imposed the same sentence if he had been subject to the lesser range at his sentencing hearing. *See* 18 U.S.C. §§ 3582(c)(2), 3553(a).

As the United States Court of Appeals for the Third Circuit has recognized,

> [i]n *Hughes v. United States*, ⸻ U.S. ⸻, 138 S. Ct. 1765, 201 L.Ed.2d 72 (2018), the Supreme Court explicitly stated that a district court "can consider the benefits the defendant gained by entering a Type–C agreement when it decides whether a reduction is appropriate (or when it determines the extent of any reduction), 'for the statute permits but does not require the court to reduce a sentence.' " *Id.* at 1777 (quoting *Freeman v. United States*, 564 U.S. 522, 532, 131 S.Ct. 2685, 180 L.Ed.2d 519 (2011)). Further, as we explained in *United States v. Baylin*, a court may consider factual matters—like [a defendant's] benefits from the Type–C agreement—as a basis for a sentence if there is "some minimal indicium of reliability beyond mere allegation" that bears "some rational relationship" to the sentence. 696 F.2d 1030, 1040 (3d Cir. 1982), *superseded by statute on other grounds as recognized in United States v. Essig*, 10 F.3d 968, 970 (3d Cir. 1993).

*United States v. Lawton*, 848 F. App'x 499, 501 (3d Cir. 2021). The prevailing principle remains that "[i]f the district court concludes that it would have imposed the same sentence even if the defendant had been subject to the lower range, then the court retains discretion to deny relief." *Hughes*, 584 U.S. at 690. Following such guidance, Judges in this District have declined to exercise their discretion to reduce sentences imposed pursuant to Rule 11(c)(1)(C) plea agreements where the defendants received substantial benefits and/or were already given the benefit of the

18

requested reduction by virtue of a below guidelines sentence. *See e.g., United States v. Rosa-Robles*, No. 2:19-CR-380, 2024 WL 449389, at *3 (W.D. Pa. Feb. 6, 2024) (Ranjan, J.) ("Mr. Rosa-Robles's [Rule 11(c)(1)(C)] plea agreement created an expectation that he would serve the time of his stipulated sentence instead of the mandatory minimum 120-180 months had the government filed a Section 851 information, a superseding indictment, or both" and "to reduce Mr. Rosa-Robles's sentence to time served based on a largely inapplicable amendment to the Guidelines would frustrate the object of the parties' agreement, the Court's acceptance of the plea, and the purposes of sentencing."); *United States v. Portis*, No. CR 21-372, 2024 WL 343085, at *1 (W.D. Pa. Jan. 30, 2024) (Horan, J.) ("The Court accepted the Rule 11(c)(1)(C) plea agreement, thereby indicating that, in light of the section 3553(a) factors, the Court believed that the parties' 11(c)(1)(C) plea agreement was appropriate. By accepting the agreement, the Court was legally bound to impose a term of imprisonment of 36 months. Thus, the parties entered into a bargained-for contract, accepted by the Court, and both sides expected the agreement would be enforced. While the Court may have the authority to upset a carefully crafted and approved bargain, it declines to do so in this case.") (footnote and citation omitted); *United States v. Strothers*, No. CR 21-385-21, 2024 WL 493281, at *4 (W.D. Pa. Feb. 8, 2024) (Hardy, J.) ("By pleading guilty to a lesser-included offense at Count One pursuant to a Rule 11(c)(1)(C) plea agreement, Defendant avoided the 10-year mandatory term of imprisonment and obtained the benefit of a significantly lower stipulated sentence.").

The same is true here.  The Court carefully considered all of the § 3553(a) factors at the sentencing hearing at which time it accepted the parties' Rule 11(c)(1)(C) agreement and fully understood, as the Government advocated, that Defendant had "no criminal history whatsoever" such that the recent amendment benefiting zero-point offenders which would lower his advisory

guidelines range does not change the Court's weighing of the § 3553(a) factors at this stage of the case. (Docket No. 289 at 26-34).  The Court further found at the sentencing hearing that the 78-month sentence was sufficient but not greater than necessary to meet the goals of sentencing because of the substantial benefits to defendant, i.e., the Government conceded its objection to the application of the safety valve without which he would have been subject to the mandatory minimum term of 120 months' incarceration.  *See Rosa-Robles*, 2024 WL 449389, at *3.  To that end, both the parties and the Court recognized the risks of further litigation of the safety valve issue and all agreed that the 78-month sentence, while above the then-advisory guidelines range of 57-71 months, was appropriate in light of the other § 3553(a) factors, i.e., the severity of the offense conduct given that Defendant and his coconspirators trafficked substantial amounts of heroin and fentanyl into this District from New York and/or New Jersey, and there remains a need to deter Defendant and others from participating in trafficking of such dangerous controlled substances, to promote respect for the law, to protect the public from further crimes and to provide just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(B).

Simply put, the fact that Defendant would be subject to a lower range of 46-57 months under Amendment 821 does not alter the Court's consideration of the remaining § 3553(a) factors and the above-guidelines sentence of 78 months remains appropriate.  *See Hughes*, 584 U.S. at 690.  Indeed, given the nature and quantity of narcotics involved along with the one of the largest seizures of cash that the Court has seen, i.e., more than $250,000 of non-taxed illegal gains, a variance above the recomputed range and the imposition of the 78-month sentence is fully supported on this record.  Additionally, neither the Court's consideration of public safety nor Defendant's post-sentencing conduct warrant a sentence reduction in this case.  *See Rodriguez*, 855 F.3d at 529 (quoting U.S.S.G. § 1B1.10, cmt. n.1(B)(ii-iii)).  To reiterate, the trafficking of

dangerous controlled substances such as fentanyl and heroin "can produce horrible consequences for individuals who become addicted to these drugs, thereby creating a significant danger to the community." *Strothers*, 2024 WL 493281, at *5. While Defendant's good conduct and completion of numerous course offerings during his period of incarceration are laudable, the Court fully expected that Defendant would do so, as it commented at the sentencing hearing. (*See* Docket No. 289 at 31). As the Court stated, "I do hope […] that you'll follow up with your plans at Fort Dix and get yourself more vocational training; because […] you've already demonstrated with the work you currently do that you can be a hard worker. With some kind of skill, that could benefit you and your family even more." (*Id.*). Despite this decision, the Court encourages Defendant to continue to engage in good behavior and participate in other available programs as such conduct may make him eligible for certain benefits from the BOP.

All told, the Court finds that the 78-month term of imprisonment remains sufficient, but not greater than necessary to meet all of the goals of sentencing in this case and denies Defendant's request for a discretionary sentence reduction under Amendment 821. *See Dillon*, 560 U.S. at 827.

V.      CONCLUSION

Based on the foregoing, Defendant's Motions [295] and [298] are denied, as the Court declines to exercise its discretion to reduce his sentence. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Date:      April 2, 2024

cc/ecf:      All counsel of record
            Erick Martinez
            Reg. No. 39329-068
            FCI Fort Dix, Box 2000
            Joint Base MDL, New Jersey 08640
            (via first class mail)

21